By the Court.—Sedgwick, J.
It is the duty of the general term to examine anew the questions of fact and law that arose upon the motion for a new trial, and which were granted subject to certain conditions, at the special term (Macy v. Wheeler, 30 N. Y. 231).
Judgment in this action was entered June 11, 1869. A new trial was asked on the ground of newly discovered evidence, and on the further ground of falsehood, fraud and perjury. The motion was made on an order to show cause, granted August 17, 1870, upon *510 affidavits sworn to on and about August 15, 1870. Proceedings supplementary to execution, for the examination of the defendants, were began May 30, 1870. These fell through, and others were had in July, 1870, on which adjournments were had until the middle of the next August, when this motion was made.
The affidavit of the defendant, Aaron Jacobs, states that he had no information,, of the facts upon which the motion was based until March 13, 1870. He delayed making the motion until August. This delay is not excused ; and, when considered in connection with the facts that will hereafter be examined, and that "in the intervening time supplementary proceedings were begun against him, was itself cause for a denial of the motion.
In main, the facts on which a new trial was asked are stated in the affidavit of Moses Kelson. In the present action, an attachment had been levied upon individual property of each of the defendants. The amount of Jacobs’ property levied upon was about eight hundred dollars in value, • and of Salhinger's, about six thousand dollars.
Kelson became a surety on an undertaking for the release of Salhinger’s property from the attachment. The present plaintiff assigned to Mr. Berry the judgment and the cause of action on the undertaking. The judgment being entered June 11, 1869, then an action in the month of July, 1869, was begun by Berry against Moses Kelson, on the undertaking. In such action, an attachment was issued against Kelson. It will not be necessary, and it would take too much time, to point to all the inferences to be drawn in this case. Most of them are suggested by a bare statement of the facts. Kelson’s affidavit avers that in April, 1868, defendant, Salhinger, asked him to become security on the undertaking to release Salhinger’s goods from the attachment in this action. At first, Kelson declined, but was called upon by the plaintiff, Woolf, and he *511 asked Nelson to sign the undertaking. Salhinger was brother-in-law to Woolf. Nelson asked Woolf what the suit and attachment meant. Woolf said that Nelson need not be alarmed, and would run no risk in signing; that the attachment was procured only to force Jacobs to release a judgment which the present defendants had obtained against Woolf, which had been assigned to Jacobs, and on which Jacobs had issued an execution against Woolf’s real estate in Sullivan county; that he, Woolf, to protect himself, had brought this action. Woolf then further stated, according to Nelson’s affidavit, with great minuteness—for instance, the minuteness a lawyer would use in pleading in its length and breadth and consequences, a tort committed by a defendant—the fraud, he, Woolf, had begun and intended to accomplish in this action. The substance was that Woolf had no cause of action against the defendants. ¿The affidavit alleges that W oolf, among other things, said that he, “the said Woolf, was going to charge that the boxes or trunks which he had sent to them, with articles for his own use and accommodation, contained merchandise for them, the said defendants, and that they agreed to sell such merchandise for him ; but that, in fact, he never had shipped or sent to said defendants any goods or merchandise, and that they had never received any goods or merchandise from him, or promised to sell any for him ; but that he had commenced a suit for such made-up claim, and had sworn out an attachment against the defendants under the mere pretense that they were about to dispose of their property to defraud creditors, and that under such attachment he had taken the goods of the defendant for goods, which he claimed, belonged to the defendants;” that he knew this would force an immediate settlement with Jacobs; that this action would never be tried, and that Nelson could safely sign the undertaking for Salhinger, *512 and he would never hear anything more about the action.
The property owned by Jacobs, that had been attached, was about, in value, eight hundred dollars ; of Salhinger’s, six thousand dollars. This is stated again to bring it in connection with Woolf’s alleged conversation. But it is impossible, within the limits made for this decision, to disentangle such a fangled mass of cobweb.
Kelson, although he has thus been clearly, explicitly and deliberately put in possession of this scheme of fraud and perjury, seems, by the general effect of his affidavit, not to have appreciated it, and he directly says, in an earlier part of his affidavit, that he had become security on the undertaking “on an attachment sworn out, and as deponent verily believes falsely sworn but, by the said plaintiff, against the said defendants, on the, as the deponent now verily believes, false and fraudulent charge that the said defendants were about to dispose of their property to defraud creditors.”
The affidavit goes on to state, that on having this talk, Woolf asked Kelson to go with him to his lawyer, ‘‘ saying that deponent would then learn the facts to be as he, said Woolf, stated them to deponent.” That is, in substance, that if he, Kelson, would not believe from Woolf’s own statement what a rascal he was, his counsel would tell him facts that would convince him. By the affidavit the lawyer had not the slightest hesitation in demonstrating Woolf’s rascality, and admitting his equal depravity, and that too, in the presence of another witness, Gustave Kelson, who had been taken there by Moses Kelson. Gustave Kelson is not stated to have been called there in the interest of anybody, or for any special purpose. Woolf and bis counsel had no fear of him, for “the said Woolf repeated to this deponent in the presence of his said attorney, Mr. *513 Smith, everything that is above stated, and that the said Mr. Smith affirmed the truth thereof, but said that his expenses and the sheriff’s expenses, amounting to five hundred dollars, on the said attachment against the said defendants, on which Salhinger’s goods had been taken, must be paid before the goods could be released, and that if that money - was paid to him the goods would be released,” and the action would never be carried any further; that Nelson could safely sign the undertaking, and would run no risk; that the said Woolf only wanted to use the action at that time for the purpose of compelling the defendant, Aaron Jacobs, to release Woolf from the judgment of four thousand eight hundred and seventy-five dollars.
It is also presented by the affidavit for our belief, that all this was said in the further hearing and presence of Mrs. Woolf, the wife of the plaintiff, and sister of Salhinger, and further, that she, before the lawyer, and the two Nelsons, “upbraided her husband for bringing said action, and for falsely swearing out the said attachment.” She never, however, seems to have tried to stop the wrong she reproached her husband with, by conveying information of it, and the means of proving it, to her brother. This seems to have led Moses Nelson to suspect something was wrong, and he believed what they said, for he swears that he, “ believing the statements of said plaintiff and his said wife and attorney, signed the said undertaking,” and this deponent also, then and there, and at the request of the said plaintiff, and on'his promise to refund the same, did pay to bis, said plaintiff’s, said attorney, Mr. Smith, the sum of five hundred dollars, and was then again informed that that would be the last, he, this deponent would ever hear of said action.”
The plaintiff must have had remarkable influence over Moses Nelson. He had refused to sign the undertaking at Salhinger’s own request, yet he submitted to *514 the force of the considerations' presented by Kelson; that he, Woolf, had brought the action in fraud, and sustained it by perjury, and as it could come to nothing, he, Kelson, had but become liable in the sum of five thousand dollars, and besides lend him, Woolf, in cash, five hundred dollars.
At the end of the affidavit, one sentence is added as a subject which, indeed, called for explanation, and this sentence discredits all the rest. It is that this deponent never informed the defendants hereof “until within the last few months,” that is, from April, 1868, to March, 1870. Kot only was he moved by good nature, or something better, to at once take very little trouble to seek, out Jacob or Salhinger, or to send either a message, to let them know how things stood, but he did not do so much, even, to protect himself against his contingent liability on the undertaking. Woolfi s statements did not create any surprise in him, for he did not, it seems, remonstrate with Woolf, or express any sympathy with Mrs. Woolf’s sound feeling on the subject. Perhaps it is more remarkable that he never tried to get his five hundred dollars back from any one.
But the affidavit states that, supposing the action had been abandoned, he gave the same no attention until after judgment was entered, and when, in the next month of July, 1869, an action was brought against himself ón the undertaking by Mr. Berry. His answer in that action will be hereafter referred to. Even this did not cause him to communicate his knowledge to Jacobs or Salhinger. After this time, he says he several times reminded Woolf of what he had told him about having no claim, &c., on which occasions Woolf said he was sorry he ever commenced the action, but he was compelled to go on.by his attorney, and to swear to the claim and have his children do so. Besides, at various times after the signing of the under *515 taking, Woolf had asked Nelson to intercede with Jacobs, to have him release Woolf from the judgment against him, “but that this deponent, not being intimate or on friendly terms with said Jacobs, refused to have anything to say to him.” And he says he never did see Jacobs even after the action was brought against himself, although clearly, it was a matter of great interest to him that Jacobs or Salhinger should know what would suffice to prevent judgment being had against them or to set it aside if obtained.
Nelson further swears that Woolf made the original statements to him at his place of business in Delancystreetin the presence of Gustave Nelson, Joshua Singer, and Frank Oopper. Woolf did not hesitate to admit and describe with great clearness his villainy before these three.
As might have been anticipated, Nelson’s answer in Berry against himself is the antipodes of his affidavit. In that answer first he said that Woolf was the real party in interest. He then “ admits that at the solicitation of the said Julius G. Salhinger” “he did, under the circumstances hereinafter stated,” execute the undertaking.
These circumstances, as afterwards stated, do not include, and they are not consistent with, those stated in his affidavit. The answer proceeds to allege that he was induced to sign the undertaking by Woolf’s representations to him “that the same was obligatory only on him, the said defendant, for the due appearance of the said Aaron Jacobs and Julius G. Salhinger in the said action,” and that, confiding in such representations, he executed the undertaking. The answer immediately goes on to say that the action ought not to be maintained, because that the said Julius G. Salhinger, colluding with Woolf and Woolf’s agent, did pay to Woolf’s agent “the sum of five hundred dollars to procure him to accept, pass and receive the said under *516 taking.” And thereupon the agent of the said plaintiff’s “assignor” (Woolf), “to secure the payment of the said sum of five hundred dollars to be paid to him by said Salhinger, did, with the knowledge and assent ; of the said plaintiff’s assignor, induce this defendant to execute the said alleged undertaking, knowingly, &c., represented to him, the said defendant,” that he would become liable on the undertaking only for the personal appearance of Jacobs and Salhinger, and these representations induced him to sign the undertaking; “and thereupon the said Salhinger paid to the agent of the said plaintiff’s assignor the said sum of five hundred dollars.” .
One of the concluding averments is that Woolf had received from Jacobs and Salhinger one thousand one hundred dollars on account of the undertaking. This furnishes another occasion to point to the incredible assertion of Nelson, that the circumstances contained in the affidavit being true, he never sought Jacobs or Salhinger, even in his own interest, until a few months before August 15,-1870. x
A statement of the contents of this answer is sufficient. It would be a waste of time to comment on them. The disagreeable details of this case would not have had the attention that has been given to them, if the court below had not taken a view from a different position, and it is proper to justify at length the reversal of the order appealed from. The unusually rigorous conditions imposed upon granting the order probably indicates the view of the merits of the case held by the learned judge who made it.
Enough has been said to show that the motion for a new trial should have been denied.
It is not important to look, except generally, at the further affidavits presented in support of the motion. Three of these affidavits are by- persons in whose presence and hearing Woolf was alleged by Nelson to *517 have unfolded with much detail his actual and intended fraud and perjury.
Another of the affidavits alleges that Woolf tried to suborn the deponent to swear, falsely in this action, Woolf at the same time stating with great exactness the nature of the fraud in the same terms as are set out in the other affidavits. Another affidavit, signed by one who makes his mark, states that he was called upon by Woolf, who, as to all the other persons making affidavits, described to him with much care what the fraud was, and why and how he undertook it, and then requested him to become his surety on the undertaking to procure the attachment. He declined so to become, and then Woolf consulted him as to whether he thought Mr. Bernstein would if he paid him for his trouble. Woolf went out and brought Mr. Solomon Bernstein to this deponent’s store, and stated to him all that he had stated to deponent. Mr. Bernstein said he disapproved of any such proceedings, and would not become security. Mr. Solomon Bernstein, who gives no residence in his affidavit, says in it that he has read the foregoing affidavit, and that its statements are true. Lastly, as if to make assurance doubly sure, Mrs. Fannie Nelson, wife of Moses Nelson, swears that she was at her husband’s store in Delancy-street at the interview between Woolf and her husband, at which, by the other affidavits, it is said that Gustave- Nelson, Joshua Singer, and Frank Coffer were present, and she says she heard Woolf say all her husband swears he heard him say. Mrs. Nelson had not been named by any one else as being present on this occasion.
Mrs. Nelson was the eighth witness who, in April, 1868, knew, from Woolf himself circumstantially the fraud he meant to commit against Salhinger, his brother-in-law, and Jacobs. Yet from that time until March, 1870, at the earliest, no one of these witnesses had conscience enough, or kindness enough, to (in some *518 way) let the defendants learn the facts, nor had chance taken some rumors of the facts to the defendants. Unless the eight stopped their mouths tighter than did ever any other eight men in possession of a secret and a scandal, and without a duty to keep still, but with a duty to speak out, in the course of these two years, hundreds would have known all about it, and the eight would not have reappeared for the first time and altogether, just when supplement tary proceedings had reached an actual point.
These affidavits have the effect of increasing the original improbability of Moses Nelson’s statement, until it gets the strength of a moral demonstration that the testimony is untrue.
It would be a waste of time to look at” the opposing affidavits and papers, to see what additional reasons they give for discrediting the affidavits in support of the motion.
It is to be hoped that this is an isolated case of the kind. It cannot be believed that there are numbers or groups of men in our society who are willing to face the day, in a court, and by agreement to give as their oaths false testimony that has not to support it even plausibility. But it does not need to be repeated to remind courts that the law should be sternly enforced against such combinations, whether they are for plaintiffs or for defendants.
These were technical grounds urged on the argument both for and against reversal of the order below. This is a case which should be decided on the merits.
The order appealed from should be reversed, with costs.